IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DAVID GARCIA,

        Plaintiff,

v.                                      CIV 20-0097 KBM

ANDREW M. SAUL,
Commissioner of Social
Security Administration,

        Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER is before the Court on Plaintiff's Motion to Reverse and/or Remand (*Doc. 15*), filed on July 15, 2020. Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b), the parties have consented to me serving as the presiding judge and entering final judgment. *See Docs. 3*; *5*; *6.* Having considered the record, submissions of counsel, and relevant law, the Court finds Plaintiff's motion is well-taken in part and will be granted in part.

## I.    Procedural History

Mr. David Garcia ("Plaintiff") filed an application with the Social Security Administration for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act on January 23, 2017. Administrative Record[1] (AR) at 224-32. Plaintiff initially alleged a disability onset date of April 13, 2014; however, he later amended this date to May 13, 2014. *See* AR at 17, 46.

---

[1] Document 10-1 comprises the sealed Administrative Record. *See Doc. 10-1.* The Court cites the Administrative Record's internal pagination, rather than the CM/ECF document number and page.

Disability Determination Services determined that Plaintiff was not disabled both initially (AR at 102-20) and on reconsideration (AR at 124-45). Plaintiff requested a hearing with an Administrative Law Judge (ALJ) on the merits of his application. AR at 164-65. Both Plaintiff and a vocational expert testified during the *de novo* hearing. *See* AR at 36-99. ALJ Jeffrey N. Holappa issued an unfavorable decision on March 15, 2019. AR at 17-29. Plaintiff submitted a Request for Review of Hearing Decision/Order to the Appeals Council (AR at 221-23), which the Council denied on December 3, 2019 (AR at 1-2). Consequently, the ALJ's decision became the final decision of the Commissioner. *Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir. 2003).

## II.    Applicable Law and the ALJ's Findings

A claimant seeking disability benefits must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 20 C.F.R. § 404.1505(a). The Commissioner must use a five-step sequential evaluation process to determine eligibility for benefits. 20 C.F.R. § 404.1520(a)(4); *see also Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009).

The claimant has the burden at the first four steps of the process to show: (1) he is not engaged in "substantial gainful activity"; (2) he has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; and (3) his impairment(s) meet or equal one of the listings in Appendix 1, Subpart P of 20 C.F.R. Pt. 404; or (4) pursuant to the assessment of the claimant's residual functional capacity (RFC), he is unable to perform

his past relevant work (PRW). 20 C.F.R § 404.1520(a)(4)(i-iv); *see also Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005) (citations omitted). "RFC is a multidimensional description of the work-related abilities [a claimant] retain[s] in spite of [his] medical impairments." *Ryan v. Colvin*, Civ. 15-0740 KBM, 2016 WL 8230660, at *2 (D.N.M. Sept. 29, 2016) (citing 20 C.F.R. § 404, Subpt. P, App. 1 § 12.00(B); 20 C.F.R. § 404.1545(a)(1)). If the claimant meets "the burden of establishing a prima facie case of disability[,] . . . the burden of proof shifts to the Commissioner at step five to show that" the claimant retains sufficient RFC "to perform work in the national economy, given his age, education, and work experience." *Grogan*, 399 F.3d at 1261 (citing *Williams v. Bowen*, 844 F.2d 748, 751 & n.2 (10th Cir. 1988)); *see also* 20 C.F.R. § 404.1520(a)(4)(v).

At Step One of the process,[2] ALJ Holappa found that Plaintiff "did not engage in substantial gainful activity during the period from his amended alleged onset date of May 13, 2014 through his date last insured of December 31, 2017." AR at 19 (citing 20 C.F.R. §§ 404.1571-1576). At Step Two, the ALJ concluded that, through his date last insured, Plaintiff had the following severe impairments: "degenerative joint disease/osteoarthritis of bilateral shoulders, right rotator cuff tear, osteoarthritis of the left knee, diabetes mellitus, diabetic polyneuropathy, chronic kidney disease, obesity, attention deficit hyperactivity disorder (ADHD), generalized anxiety disorder, major depressive disorder, post-traumatic stress disorder (PTSD), unspecified psychosis, and obsessive compulsive disorder." AR at 20 (citing 20 C.F.R. § 404.1520(c)). In contrast,

___

[2] ALJ Holappa first found that Plaintiff "last met the insured status requirements of the Social Security Act on December 31, 2017." AR at 19.

3

the ALJ concluded that Plaintiff's obstructive sleep apnea, primary insomnia, hernia, hypertension, and anemia did "not cause more than minimal limitation in [his] ability to perform basic work activities" and were therefore "nonsevere." AR at 20.

At Step Three, the ALJ found that Plaintiff "did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 [C.F.R.] Part 404, Subpart P, Appendix 1." AR at 20 (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). Indeed, the ALJ determined that, through his date last insured, Plaintiff had the RFC to perform:

> light work as defined in 20 [C.F.R. §] 404.1567(b). [Plaintiff] can lift/carry up to 20 pounds occasionally and 10 pounds frequently; can sit up to six hours in an eight-hour day and can stand/walk up to six hours in an eight-hour day; and can push/pull as much as he can lift/carry. He is limited to occasional climbing of ramps and stairs, never climbing ladders or scaffolds, and occasional balancing, stooping, kneeling, crouching, and crawling. He is also limited to occasional bilateral overhead reaching. He is further limited to no exposure to unprotected heights or moving mechanical parts. Finally, [Plaintiff] is limited to simple, routine tasks, simple work-related decisions, maintaining attention and concentration for two-hour segments, and occasional interactions with others including supervisors, co-workers, and the general public.

AR at 22. The ALJ determined that Plaintiff was incapable of performing his PRW but could perform the positions of assembler, production; mail clerk; and routing clerk. AR at 28. Ultimately, the ALJ found that Plaintiff "was not under a disability, as defined in the Social Security Act, at any time from May 13, 2014, the amended alleged onset date, through December 31, 2017, the date last insured." AR at 28 (citing 20 C.F.R. § 404.1520(g)).

## III.   Legal Standard

The Court must "review the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting *Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005)). A deficiency in either area is grounds for remand. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161, 1166 (10th Cir. 2012) (citation omitted). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lax*, 489 F.3d at 1084 (quoting *Hackett*, 395 F.3d at 1172). "It requires more than a scintilla, but less than a preponderance." *Id.* (quoting *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004) (alteration in original)). The Court will "consider whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases, but [it] will not reweigh the evidence or substitute [its] judgment for the Commissioner's." *Id.* (quoting *Hackett*, 395 F.3d at 1172 (internal quotation marks omitted)).

"The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Id.* (quoting *Zoltanski*, 372 F.3d at 1200). The Court "may not 'displace the agenc[y's] choice between two fairly conflicting views, even though the [C]ourt would justifiably have made a different choice had the matter been before it de novo.'" *Id.* (quoting *Zoltanski*, 372 F.3d at 1200).

## IV.   Discussion

Plaintiff contends that the following issues require reversal: (1) the ALJ failed to

properly consider the opinions of Dr. Koltuska-Haskin; (2) the ALJ failed to include any adaptive functioning limitations in the RFC; (3) the ALJ made an improper inference that his diabetes was controlled by only oral medications; (4) the ALJ failed to consider the reasons Plaintiff did not have surgery or participate in physical therapy; (5) the ALJ failed to resolve a conflict between the vocational expert's testimony and the Dictionary of Occupational Titles; and (6) the ALJ failed to adequately address limitations caused by Plaintiff's sleep apnea and insomnia. *Doc. 15* at 20-24.

Two arguments are well-taken: (1) Plaintiff's argument that the ALJ committed reversible error when he failed to include any adaptation limitations in the RFC, and (2) his argument that the ALJ failed to consider the reasons Plaintiff did not undergo right shoulder surgery. This matter should be remanded for the ALJ to provide a proper assessment of Plaintiff's RFC in light of moderate adaptation limitations and the reasons Plaintiff did not obtain right shoulder surgery.

### A. On remand, the ALJ should consider addressing additional factors in weighing the opinions of Dr. Koltuska-Haskin.

Plaintiff argues that the "ALJ's consideration of Dr. Koltuska-Haskin's report is wholly inadequate." *Doc. 15* at 20. Barbara Koltuska-Haskin, Ph.D., a clinical neuropsychologist, evaluated Plaintiff on June 25, 2018, July 3, 2018, July 6, 2018, and July 9, 2018, and provided a report of her findings and opinions. AR at 719-28. In her report, she explained that Plaintiff was referred to her so that she could "assess his current level of cognitive and emotional functioning." AR at 721. Dr. Koltuska-Haskin evaluated Plaintiff, conducted a number of psychological evaluations and tests, and diagnosed Plaintiff with Bipolar Disorder, Frontal Lobe and Executive Function Deficit, Memory Impairment, Attention and Concentration Deficit, and PTSD. AR at 728. She

6

also made the following determination: "he is presently unable to work to support himself and needs to be placed on disability." AR at 728. Additionally, Plaintiff identifies a number of other findings embedded in Dr. Koltuska-Haskin's report, including that he had: (1) a full scale IQ of 67; (2) compromised cognitive resources; (3) poor ability to perform mental operations on immediate memory; (4) below average coordination; (5) difficulty in executive functioning; (6) poor ability to recall verbal and non-verbal information after a delay; and (7) poor concept formation, impulsivity, and lapses in judgment and insight. *Doc. 15* at 20 (citing AR at 721-28).

The ALJ discounted Dr. Koltuska-Haskin's opinion, explaining that he had given "little weight" to a medical source statement from a renal physician assistant and even "[l]ess weight" to the opinions of Dr. Koltuska-Haskin for two reasons. AR at 26. First, the ALJ took issue with Dr. Koltuska-Haskin's conclusion that Plaintiff should be placed on disability, as this was a determination "reserved to the Commissioner." AR at 26. The ALJ is correct that "[u]nder the controlling regulations, the final responsibility for deciding the ultimate issue of whether a social security claimant is 'disabled' or 'unable to work' is reserved to the Commissioner." *Mayberry v. Astrue*, 461 F. App'x 705, 708 (10th Cir. 2012) (citations omitted); 20 C.F.R. § 404.1527(d)(1) (effective for claims filed from Aug. 24, 2012 to Mar. 26, 2017). Although opinions concerning issues reserved to the Commissioner should not "be ignored[,]" *see Doyal*, 331 F.3d at 764, the ALJ here did not entirely overlook Dr. Koltuska-Haskin's disability opinion but instead articulated an independent reason for rejecting it.

Specifically, the ALJ found that Dr. Koltuska-Haskin's opinion came "seven months after [Plaintiff's] date last insured." AR at 26. The record confirms that Plaintiff's

insured status expired in December 2017 (*see* AR at 19), while Dr. Koltuska-Haskin's report assessed Plaintiff's "*current* level of cognitive and emotional functioning" at the time it was written, in July 2018. *Compare* AR at 19, *with* AR at 721 (emphasis added). Further the report itself reveals that Dr. Koltuska-Haskin did not review Plaintiff's prior medical records, as they were not available at the time of the evaluation (*see* AR at 723); nor did she purport to offer retrospective opinions. *See* AR 719-28. Instead, she opined that Plaintiff was "presently" unable to work in July 2018. *See* AR at 728. Notably, the ALJ's treatment of Dr. Koltuska-Haskin's opinion was consistent with his treatment of the opinion of Plaintiff's renal physician's assistant, which the ALJ also discounted on the basis that it was a "post-date last insured opinion." AR at 26. The Court is satisfied that the reasons the ALJ articulated for discounting the weight he gave Dr. Koltuska-Haskin's opinion were specific and legitimate.

But Plaintiff also contends that the ALJ failed to adequately evaluate Dr. Koltuska-Haskin's opinion in light of the requisite factors provided in 20 C.F.R. § 404.1527. *Doc. 15* at 21 (citing *Nagelschneider v. Astrue*, 617 F. Supp. 2d 1115, 1118 (D. Colo. 2009)). He argues that the ALJ failed to consider Dr. Koltuska-Haskin's unique expertise as a neuropsychologist, the extensive testing she performed on Plaintiff, and the four separate dates on which she tested and observed him. *Id.* Additionally, Plaintiff suggests that the ALJ neglected to consider the consistency of Dr. Koltuska-Haskin's opinions with the other evidence of record and with the testing data. *Id.*

The factors that the ALJ was required to consider under the applicable regulation were as follows:  (1) the examining relationship; (2) the treatment relationship, including the length of the relationship, frequency of examination, and nature and extent of the

relationship; (3) supportability of the opinions; (4) consistency of opinions with the record as a whole; (5) specialization; and (6) other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(1)-(6) (effective for claims filed from Aug. 24, 2012 to Mar. 26, 2017). But the ALJ was not required to "apply expressly each of the six relevant factors in deciding what weight to give [the] medical opinion[s]." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). Instead, the decision need only be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave . . . the opinion and the reasons for that weight." *Id.* (quotation omitted).

Effectively, the ALJ afforded "[l]ess weight" than "little weight" to Dr. Koltuska-Haskin's opinion. *See* AR at 26. Moreover, the Court is able to follow the two reasons he offered for discounting Dr. Koltuska-Haskin's opinion. The ALJ did not, however, directly address *any* of the relevant factors under 20 C.F.R. § 404.1527(c), with the possible exception of the final catchall factor (i.e. other factors that tend to support or contradict an opinion).

The ALJ's discussion of the *relevant* factors was certainly not comprehensive. Although the Court reverses and remands on other grounds, as discussed below, on remand the ALJ should consider addressing additional factors to bolster, if possible, his findings with regard to Dr. Koltuska-Haskin's opinions.

### B. The ALJ's RFC assessment fails to account for Plaintiff's moderate limitations in adaptive functioning.

Plaintiff contends that the ALJ's RFC does not account for his moderate limitations in adapting or managing himself. *Docs. 15* at 21-22; *20* at 7. As Plaintiff notes, the ALJ explicitly found moderate limitations in his adaptive functioning at Step Three of his

sequential evaluation. *Doc. 15* at 21; AR at 22. But Plaintiff maintains that the ALJ inexplicably failed to include any limitations in his RFC to account for these adaptation limitations. *Doc. 15* at 21 (citing AR at 22). The Commissioner, in contrast, insists that the ALJ adequately accounted for Plaintiff's moderate adaptation limitations in his RFC assessment. *Doc. 17* at 9.

Plaintiff also comes at the issue of adaptive functioning limitations from a slightly different angle. He argues that when the ALJ formulated his RFC, he failed to explain why he adopted some of the opinions of the state agency psychological consultants, Drs. Mark McGaughey and Joan Holloway, but rejected their opinions that he was moderately limited in his ability to respond to changes in the work setting. *Doc. 15* at 22 (citing *Wilson v. Colvin*, 541 F. App'x 869, 871 (10th Cir. 2013)). ALJs are required to weigh medical opinions and to provide appropriate explanations for accepting or rejecting such opinions. *See Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). Here, Plaintiff emphasizes that the ALJ accorded "[g]reat weight" to the psychological consultants' opinions, but he maintains that the ALJ's RFC conflicts with these opinions without providing any explanation for his rejection of their moderate adaptation limitations. *Doc. 15* at 22 (citing *Wilson*, 541 F. App'x at 871).

The Commissioner suggests that Plaintiff has mistakenly referred the Court to the "preliminary findings" in Section I of the mental residual functional capacity assessments ("MRFCAs") of Drs. McGaughey and Holloway's, rather than to their narrative conclusions in Section III. *Doc. 17* at 9. Relying upon *Carver v. Colvin*, 600 F. App'x 616 (10th Cir. 2015), the Commissioner insists that it is the Section III narrative, not the Section I findings, to which the ALJ and now the Court must look. *Doc. 17* at 10.

The Commissioner notes that, pursuant to the Social Security Administration's Program Operations Manual Systems ("POMS") § DI 24510.060, "Section I is merely a worksheet to aid in deciding the presence and degree of functional limitations and the adequacy of the documentation and does not constitute the RFC assessment." *Id.* (quoting POMS § DI 24510.060). Thus, he maintains that it is the Section III narrative, not the Section I findings, that is of consequence here. *Id.* (citing *Carver*, 600 F. App'x at 619).

But, importantly, the Tenth Circuit in *Carver* went on to explain that an ALJ may not "turn a blind eye to moderate Section I limitations." *Id.* At first blush, there appears to be some inconsistency in the Tenth Circuit's explanation that Section I is a mere worksheet that does not constitute the RFC assessment and its admonition to ALJs and reviewing courts not to "turn a blind eye" to moderate limitations in Section I. Some consideration of the administrative process underlying the MRFCA forms is helpful in this regard.

At the initial and reconsideration stages of the administrative process, the disability determination is made by a "medical consultant," who is an expert in evaluating claims for disability benefits. *See* POMS § DI 24501.00(B)(2). The agency consultant serves as the adjudicator at the initial and reconsideration stages. *See id.* The POMS instructs that in order "[t]o assure a comprehensive assessment of mental RFC, the [MRFCA form] requires the medical or psychological consultant . . . first to record preliminary conclusions about the effect of the impairment(s) on each of four general areas of mental functions [in Section I], then to prepare a narrative statement of mental RFC [in Section III]." POMS § DI 24510.061(A) (emphasis omitted). A claimant is considered moderately impaired if the "evidence supports the conclusion that the

individual's capacity to perform the activity is impaired," POMS § DI 24510.063(b)

(emphasis omitted). If the doctor finds the claimant moderately limited in a certain area,

"[t]he degree and extent of the capacity or limitations must be described in a narrative

format in Section III." POMS § DI 24510.063(B)(2) (emphasis omitted).

　　　　If the disability case later comes before an ALJ, *all* of the findings on the MRFCA

form constitute nonexamining opinions about the disability claim, not merely those

opinions contained within Section III. *See* POMS DI § 24515.007(1)(b) ("All evidence

from nonexamining sources is opinion evidence."); *see also* POMS § DI

24515.002(B)(2) ("Medical opinions are statements from physicians and

psychologists . . . that reflect judgments about the nature and severity of a claimant's

impairment(s).").

　　　　Although the Tenth Circuit has acknowledged the distinction between Section I

and Section III of the MRFCA, it has nevertheless required, in *Carter* and in numerous

other cases, that ALJs account for findings from *both* sections. *See, e.g.*, *Nelson v.

Colvin*, 655 F. App'x 626 (10th Cir. 2016) (referring to the doctor's Section I findings and

determining that the ALJ's RFC accounted for all of the Section I findings); *Lee v.

Colvin*, 631 F. App'x 538, 541 (10th Cir. 2015) (reasoning that the POMS distinction

between Sections I and III "does not mean, of course, that the ALJ should turn a blind

eye to any moderate limitations enumerated in Section I that are not adequately

explained in Section III"); *Fulton v. Colvin*, 631 F. App'x 498, 502 (10th Cir. 2015)

(determining that an ALJ may look to only the Section III narrative if it "does not

contradict any Section I limitations and describes the effect each Section I limitation

would have on the claimant's mental RFC"); *Jaramillo v. Colvin*, 576 F. App'x 870, 874

(10th Cir. 2014) (acknowledging the POMS' distinction between Section I and Section III and analyzing whether the ALJ's RFC adequately accounted for the Section I findings).

In short, the POMS' distinction, discussed in *Carver*, between Section I and Section III of the MRFCA form is aimed at guiding the agency consultants in making their disability determinations at the initial and reconsideration level; it does not dictate how the ALJ should weigh the consultants' findings when assessing the RFC. *See Silva v. Colvin*, 203 F. Supp. 3d 1153, 1159–60 (D.N.M. 2016) (citing POMS § DI 24515.007(3)(b) ("At the . . . [ALJ] . . . hearing . . . level . . . , the ALJ . . . will consider findings of fact made by . . . consultants . . . regarding the nature and severity of an individual's impairment(s) as expert opinion evidence of nonexamining sources.")). Instead, an ALJ must consider *both* Section I and Section III findings as nonexamining opinions. *See* POMS §§ DI 24515.007(1)(b); 24515.002(B)(2).

Moreover, the POMS *require* some description of the "degree and extent" of any Section I limitation in the Section III narrative. *See Carver*, 600 F. App'x at 619 (citing POMS DI § 24510.063.B.2). Indeed, an MRFCA cannot be considered substantial evidence in support of an ALJ's RFC finding if its Section III narrative fails to describe the effect that each Section I moderate limitation has on the claimant's functional ability. *Id.* Likewise, the MRFCA fails to constitute substantial evidence in support of an ALJ's RFC if the Section III narrative "contradicts" the Section I moderate limitations. *Id.* As such, the foundational question here is whether the psychological consultants' Section III narratives adequately encapsulated the moderate adaptation limitations they found in Section I. *Id.*

In Section I, Drs. McGaughey and Holloway noted moderate limitations in

13

Plaintiff's ability to "respond appropriately to changes in the work setting." AR at 118, 143. But at Step III they did not expressly include adaptation limitations in the narrative portions of their MRFCAs; nor did they otherwise describe the degree or extent of this moderate limitation. *See* AR at 119, 143. Instead, they simply limited Plaintiff to "unskilled work." AR at 119, 143.

As for the ALJ, at Step Three of his sequential evaluation, he too found moderate limitations in Plaintiff's ability to adapt or manage himself. AR at 22. He referenced Plaintiff's subjective reports of difficulty in this area, including with "activities of daily living, but mainly due to pain, as opposed to mental limitations[,]" "handl[ing] stress[,]" and "feel[ing] paranoid out in public." AR at 22 (citing AR at 289-98, 324-32, 333-42, 447-56, 497-504, 588-603, 613-50). In his RFC, the ALJ went slightly further than Drs. McGaughey and Holloway, limiting Plaintiff to "simple, routine tasks, simple work-related decisions, maintaining attention and concentration for two-hour segments, and occasional interactions with others including supervisors, co-workers, and the general public." AR at 22. Yet, the ALJ said nothing of the degree or extent to which Plaintiff could respond to changes in the workplace. *See* AR at 22.

The ALJ indicated that he had considered the opinions of Drs. McGaughey and Holloway in assessing Plaintiff's RFC and that he gave these opinions "[g]reat weight." AR at 26 (citing AR at 117-19, 141-43). He specified that he considered the consultants' "moderate limitations in the 'B' criteria" as well as their "unskilled mental [RFCs]." AR at 26. Thus, he at least purported to consider both the Section I limitations as well as the Section III RFC, as he must.

The conundrum for the Court is that neither the consultants' RFCs nor the ALJ's

slightly more restrictive RFC expressly include any limitations in adaptive functioning. Nor do the respective adjudicators offer any explanation as to the degree and extent of Plaintiff's adaptation limitation, apart from limiting him to unskilled work, or in the ALJ's case, simple, routine work with occasional interactions. But adaptive functioning is *critical* when performing unskilled work, even according to the Administration's own regulations. *See* 20 C.F.R. §§ 404.1545(c)). Indeed, "[t]he basic demands of competitive remunerative unskilled work include the abilit[y] (on a sustained basis) to . . . deal with changes in a routine work setting." SSR 85-15, 1985 WL 56857, at *4 (Jan. 1, 1985); *see also* POMS § DI 25020.010(A)(3)(a). This ability to "deal with changes in a routine worksetting" is separate and distinct from the ability to complete simple, routine tasks, to make simple work-related decisions, or to interact occasionally with supervisors, co-workers and the public. *See* POMS § DI 25020.010(A)(3)(a); *see also Gonzales v. Colvin*, 213 F. Supp. 3d 1326, 1332 (D. Colo. 2016) (explaining that "an inability to adapt to changes in the workplace is inconsistent with the most fundamental demands of unskilled jobs" (citing SSR 85-15, 1985 WL 56857, at *4)).

A limitation to "simple work," as the ALJ put it, or to "unskilled" work, as Drs. McGaughey and Holloway phrased it, is generally "insufficient to address a claimant's mental limitations." *See Groberg v. Astrue*, 505 F. App'x 763, 770 (10th Cir. 2012) (citing *Chapo v. Astrue*, 682 F.3d 1285, 1290 n.3 (10th Cir. 2012)). While there are exceptions to this rule, they do not appear to be applicable here.  For one thing, neither the ALJ nor Drs. McGaughey and Holloway explained how Plaintiff's ability to perform unskilled or simple, routine work was unaffected by his moderate limitation in adaptive functioning. *Cf. Vigil v. Colvin*, 805 F.3d 1199, 1203-04 (10th Cir. 2015); *see also*

*Carver*, 600 F. App'x at 619. Moreover, this is not a situation in which Plaintiff's adaptation limitation "could be so obviously accommodated by a reduction in skill level" that it could be left out of the RFC. *See Wayland v. Chater*, No. 95-7029, 1996 WL 50459, at *2 (10th Cir. Feb. 7, 1996).

The Tenth Circuit has cautioned that a "moderate impairment is not the same as no impairment at all[,]" *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007), and that moderate limitations "must be accounted for in an RFC finding[,]" *Jaramillo*, 576 F. App'x at 876. Here, the Commissioner suggests that because "the record did not reflect a complete inability [by Plaintiff] to manage oneself when around others[,]" it was therefore reasonable for the ALJ to limit Plaintiff to work with no more than occasional interactions with others. *Doc. 17* at 11. The problem with the Commissioner's position is that it has been supplied by him *post-hoc* and not by the ALJ in the first instance.

Further, Plaintiff's position to the contrary finds support in a recent unpublished but persuasive opinion from the Tenth Circuit. In *Parker v. Commissioner*, 772 F. App'x 613 (10th Cir. 2019), the agency obtained medical opinions from Donald Degroot, Ph.D., to which the ALJ ascribed "great" weight. *Id.* at 615. Like the agency consultants here, Dr. Degroot opined that the plaintiff was moderately impaired in his ability to respond to changes in the usual work setting. *Id.* at 616. The court noted, however, that the ALJ omitted this limitation in his findings about what the plaintiff "could do despite his limitations." *Id.*

The Commissioner in *Parker* made an argument similar to the one he advances

here. He maintained that by limiting the complexity and pace[3] of the plaintiff's work, the ALJ adequately captured the moderate limitations in Plaintiff's "abilities to respond appropriately to usual work situations and to changes in the usual work setting." *Id.* The Tenth Circuit cited *Vigil*, 805 F.3d at 1203-04, and acknowledged that it had previously held that an ALJ "can sometimes account for mental limitations by limiting the claimant to particular kinds of work." *Id.* Nevertheless, it insisted that the ALJ must "ordinarily explain how a work-related limitation accounts for mental limitations reflected in a medical opinion," unless the connection between the limitation and the work is obvious. *Id.* (citing *Wayland*, 1996 WL 50459). The court determined that any connection between the moderate adaptation limitations found by Dr. Degroot and the RFC was not obvious or adequately explained by the ALJ. *Id.* It offered the following rationale:

> [A]ny job would typically require an ability to respond appropriately to usual work situations and changes in routine work settings. We thus conclude that the agency's findings restricting the complexity and pace of [the plaintiff's] work, did not adequately incorporate Dr. Degroot's opinion involving a moderate limitation in the ability to respond appropriately to usual work situations and changes in a work setting.

*Id.* (citations omitted).

The Tenth Circuit also emphasized that the ALJ had not expressed any disagreement with Dr. Degroot's opinion, instead affording it great weight. *Id.* It held that, "[g]iven the discrepancy between the [ALJ's] assessment of mental capacity and the medical opinions [finding a moderate adaptation limitation], the [ALJ] had an obligation to provide an explanation." *Id.* at 617 (citing SSR 96-8p, 1996 WL 374184, at

---

[3] In *Parker*, the ALJ found that the plaintiff was unable to engage in work that required complex tasks or instructions or to perform work at a pace customary for a production line. *Parker*, 772 F. App'x at 616.

*7 (July 2, 1996)). Because the ALJ did not supply such an explanation, the court determined that he had legally erred and that remand was required. *Id.* The court went further, determining that the failure to explain the omission of limitations in the ability to respond appropriately to usual work situations and routine changes in work settings could not be characterized as harmless error. *Id.*

In light of *Parker*, the applicable regulations, and Tenth Circuit law interpreting those regulations, the Court ultimately concludes that the ALJ's RFC assessment failed to account for Plaintiff's moderate limitations in adaptive functioning. Likewise, the ALJ failed to explain why he rejected the moderate adaptation limitations opined by Drs. McGaughey and Holloway in formulating the RFC. Consequently, remand is required so that the ALJ may properly assess Plaintiff's RFC, to include some explanation of the degree and extent of his adaptation limitations. The Court grants Plaintiff's motion as to this issue.

### C. The ALJ's findings that Plaintiff used only oral medication to treat his diabetes mellitus are supported by substantial evidence.

Plaintiff maintains that "[f]or all intents and purposes, the ALJ found that [his] diabetes was not 'really' out of control because he was treated with only oral medication." *Doc. 15* at 22. He argues that the medical records do not support this finding. *Id.* (citing AR at 668-69, 696). Moreover, he submits that remand is warranted because the ALJ's finding that he took only oral medication for his diabetes was "fundamental" to the determination that his diabetes was not disabling. *Id.* The Commissioner, in contrast, insists that the record shows that Plaintiff *was* taking only oral medications during the relevant period. *Doc. 17* at 11-12 (citing AR at 25-26). As such, he maintains that substantial evidence supports the ALJ's findings. *Id.*

18

In his decision, the ALJ acknowledged that Plaintiff's A1c level[4] was "high at 7.9," but he noted that Plaintiff had "overall normal physical examination" and "diabetes mellitus without complications [was] treated with oral medication." AR at 24 (citing AR at 378-406).  He observed that in February 2017, a kidney specialist advised Plaintiff on diet and exercise and urged him to lose weight. AR at 24; *see also* AR at 440-43. The ALJ also noted that Plaintiff's renal ultrasound was "unremarkable. AR at 24; *see also* AR at 441. He also observed that the record did not reveal pain or apparent limitations associated with Plaintiff's chronic kidney disease or diabetes and that Plaintiff was not on dialysis. AR at 25-26. On the other hand, the ALJ acknowledged that Plaintiff's treatment records indicated "uncontrolled diabetes" and explained that Plaintiff's A1c level in March 2017 was 7.4. AR at 25.

The ALJ discussed 2018 records from a renal physician's assistant in which the physician's assistant suggested that dialysis may become necessary in the future after continued kidney function decline. AR at 26; *see also* AR at 653. However, the ALJ characterized this opinion as "a post-date last insured opinion about future possible symptoms" and gave it "little weight." AR at 26. Indeed, the ALJ remarked that Plaintiff "does not appear to have much, if any further treatment [after March 2017] for his kidney disease or diabetes until after his date last insured." AR at 24 (citing AR at 651-57). Ultimately, the ALJ determined that at the time Plaintiff's insured status expired, his

---

[4] "The hemoglobin A1c test tells . . . [a person's] average level of blood sugar over the past 2 to 3 months." *Hemoglobin A1c (HbA1c) Test for Diabetes*, WebMD, https://www.webmd.com/ diabetes/guide/ glycated-hemoglobin-test-hba1c#1-4 (last visited Dec. 10, 2020). People with diabetes require a frequent A1c test to determine if their "levels are staying within range." *Id.* "The target A1c level for people with diabetes is usually less than 7%. The higher the hemoglobin A1c, the higher [the] risk of having complications related to diabetes." *Id.*

diabetes did not result in disabling limitations. *See* AR at 25-26.

The Court's review of the record confirms that although Plaintiff's diabetes was characterized as "uncontrolled," as the ALJ acknowledged, his A1c level during the relevant period was not drastically above the 7.0 target.[5] *See* AR at 440-42. Indeed, it was only *after* Plaintiff's December 2017 date last insured that the record documented a significant worsening of his A1c levels. In February 2018, Plaintiff's A1c had risen to 8.9%; in early June 2018, it was 13.5%; by late June 2018, it had reached to 14.6%. *See AR* at 658, 663,693-94. In late June 2018, six months after Plaintiff's date last insured, Plaintiff's health care providers indicated that he had shown "very poor control [of his diabetes] in the previous 3 months." *See* AR at 658, 693. Thus, the period of noted "poor control" occurred well outside of the relevant period for disability benefits.

Before this deterioration, in February and March of 2017, Plaintiff's diabetes *was* treated with only oral medication, as the ALJ found. *See* AR at 441, 443. In addition to the oral medications, Plaintiff's health care providers at that time recommended that he say well-hydrated, avoid soda, limit caffeine, limit salt intake, exercise, and lose weight. *See, e.g.*, AR at 441-43. The records suggest that Plaintiff transitioned to using insulin for treatment of his diabetes in mid-May 2018. AR at 667 (2018 record indicating that Plaintiff began taking Basaglar insulin in May 2018); 686-88 (Feb. 19, 2018 records noting that Plaintiff suffered from diabetes "without long-term current use of insulin" and listing Plaintiff's medications, which included oral medication to treat diabetes, but no insulin); 712 (May 31, 2018 record indicating Plaintiff "recently started on Basaglar"

---

[5] In February and March of 2017, Plaintiff's A1C was 7.4. AR at 441, 443 His goal A1c was less than 7.0. AR at 441, 443.

insulin).

But Plaintiff contends that the ALJ's finding that his diabetes was treated with only oral medication was not restricted to the period before his date last insured. *Doc. 20* at 8. Plaintiff characterizes the Commissioner's rationale – that the ALJ determined Plaintiff was taking only oral medications *during the relevant period* – as a "classic impermissible *post hoc* rationalization" for an erroneous finding by the ALJ. *Id.* But the Court is satisfied that the ALJ's finding concerning oral medication was implicitly constrained by the relevant period. After all, Plaintiff's disability claim ultimately turned on whether he was disabled on the date he was last insured, not on whether he became disabled thereafter. *See* AR at 27 (determining that Plaintiff "was not under a disability, as defined in the Social Security Act, at any time from May 13, 2014, the amended alleged onset date, through December 31, 2017, the date last insured") (citing 20 C.F.R. § 404.1520(g)). Plaintiff's arguments to the contrary are not persuasive.

In sum, based on its review of the record, the Court rejects Plaintiff's contention that the ALJ lacked a basis in the record for his finding that Plaintiff's diabetes was treated with only oral medication. Rather, the record demonstrates that Plaintiff *was* treated with only oral medication *during the relevant period* and that his A1c, albeit slightly high, had not yet reached levels requiring the use of insulin. The Court is satisfied that the ALJ's determination is supported by substantial evidence, and it will deny Plaintiff' s motion on this ground.

### D.  The ALJ improperly failed to consider whether there was a justifiable excuse for Plaintiff's failure to undergo right shoulder surgery.

At the administrative hearing, Plaintiff testified that his severe shoulder pain was treated with painkillers. AR at 65-66. According to Plaintiff, his medical providers

previously administered cortisone shots, but when his weight increased and his A1c levels "started getting out of control," they would no longer administer these injections. AR at 66. Additionally, Plaintiff testified that his primary care physician, Jeffrey Thomas, M.D., would not clear him for surgery on his right shoulder because his A1c level was at 14.[6] AR at 78-79.

In his briefing to this Court, Plaintiff suggests that medical records from February 23, 2017, confirm that Dr. Thomas would not clear him for right shoulder surgery, which at that time was scheduled to take place on March 6, 2017. *Doc. 15* at 22 (citing AR at 566). Plaintiff contends that the ALJ failed to discuss the reasons he did not undergo a recommended shoulder surgery or continue with cortisol injections. *Docs. 15* at 22-23; *20* at 8. Plaintiff insists that remand is required for the ALJ to determine whether Plaintiff's failure to follow the doctors' recommended treatment for his shoulder impairment was excusable. *Doc. 15* at 23.

The Commissioner contends that Plaintiff's assertions are not supported by the record. *Doc. 17* at 13. He maintains, for instance, that the record shows that Plaintiff *elected* not to have shoulder surgery "because his symptoms were well-controlled with other modalities." *Id.* More specifically, he insists that Plaintiff opted to defer his shoulder surgery because cortisone shots were highly effective at relieving his shoulder pain. *Id.*

Plaintiff counters, arguing that the Commissioner has provided an impermissible *post-hoc* rationalization for the ALJ's disability determination. *Doc. 20* at 8. As such, he

---

[6] The records suggest that Plaintiff A1C level did not reach 14 until June 21, 2018, well after his date last insured. AR at 658. Nevertheless, as discussed hereinafter, the records suggest that Dr. Thomas would not clear Plaintiff for right shoulder surgery even during the relevant period.

urges the Court to ignore the Commissioner's argument on this issue. *Id.* The Court is satisfied, however, that the rationalization offered by the Commissioner is effectively the same rationale provided by the ALJ in his decision.

The ALJ deemed Plaintiff's right rotator cuff tear, degenerative joint disease, and osteoarthritis in both shoulders to be severe impairments. AR at 20. He did not, however, find these conditions disabling. *See* AR at 20-26. The ALJ determined that the intensity, persistence, and limiting effects of Plaintiff's shoulder impairments, as described by Plaintiff, were not fully supported by the record because he had not followed through with recommended treatment. AR at 25. The ALJ noted that "[Plaintiff] went only once to physical therapy; was scheduled multiple times for arthroscopic surgery, but did not follow through; and failed to follow up consistently for orthopedic treatment." AR at 25.

In contrast to this finding, Plaintiff maintains that he was ineligible for surgery because Dr. Thomas would not clear him. Some examination of the relevant records is necessary to determine whether they support Plaintiff's position or that of the Commissioner and ALJ.

In August 2015, Plaintiff presented for an orthopedic evaluation of his right shoulder by Douglas C. Allen, M.D. AR at 422-24. An MRI showed a complete tear of his right rotator cuff, and Dr. Allen recommended shoulder surgery. AR at 421. Dr. Allen reported, however, that the "surgery will be postponed at the patient's request." AR at 421. Dr. Allen simultaneously ordered a physical therapy evaluation and treatment. AR at 421. Plaintiff attended physical therapy once in October 2015. AR at 417. Despite being instructed to attend therapy sessions once per week, AR at 418, Plaintiff was

discharged in January 2016 for failure to show up for appointments or to reschedule. AR at 414; *see also* AR at 416 (Oct. 19, 2015 record indicating "pt failed to arrive to appt"). The records do not show any additional orthopedic treatment for Plaintiff's shoulders until January 2017.

A January 2, 2017 record from a visit with Dr. Thomas explains that "Dr. Thomas will not allow any kind of surgery due to the fact that [Plaintiff] is not in good health to heal properly to recover." AR at 665. The record further indicates that Dr. Thomas "will no longer give cortisone shots to help with the pain in the shoulders because it greatly increase[s] his sugar levels." AR at 665. Instead, Dr. Thomas, would "only prescribe Ibuprofen 600 mg 3 x a day for the pain for his torn rotator cuffs." AR at 665.

The next month, in February 2017, records from Plaintiff's "pre-op clearance" appointment with Dr. Thomas reveal that he advised Plaintiff that there were outstanding items that Plaintiff would need to address before he would write a "final clearance" for the contemplated shoulder surgery. AR at 566-68. The outstanding requirements included a colonoscopy, proof of renal clearance from Plaintiff's nephrologist, and a stress test. *See* AR at 557, 566-68.

Two months later, in April of 2017, Plaintiff was still working toward completion of the requirements for surgery clearance. AR at 557. Dr. Thomas indicated that Plaintiff was "still interested in getting shoulder surgery." AR at 557. However, Plaintiff's EGD[7]

---

[7] An EGD, or upper endoscopy, is a "procedure in which a thin scope with a light and camera at its tip is used to look inside the upper digestive track." *EGD (Upper Endoscopy)*, WebMD, https://www.webmd.com/digestive-disorders/upper-endoscopy#1 (last visited Dec. 10, 2020).

had been "deferred for uncertain reasons" and his EST[8] was scheduled for a future date. AR at 557. As to the other conditions for surgery clearance, Plaintiff reported that his nephrologist had "cleared him and his colonoscopy was good recently." AR at 557. Dr. Thomas advised Plaintiff that "if the EST [came] back normal and his labs are good (AIC < 8.0 and Hgb > 13)[, he] would clear him for the shoulder surgery." AR at 559.

On August 29, 2017, Plaintiff complained to Dr. Thomas of continued "bilateral shoulder pain" and indicated that he was scheduled to see his orthopedist to discuss surgical repair of his right rotator cuff. AR at 546. Plaintiff saw Douglas Allen, M.D. the next day for left knee pain and to schedule his shoulder surgery. AR at 529. He reported to Dr. Allen that he wanted to schedule his right shoulder surgery for the following month, September of 2017. AR at 529. Dr. Allen examined Plaintiff's right shoulder, finding reduced range of motion and muscle strength. AR at 530-31. He recommended a "Right Shoulder arthroscopic rotator cuff repair" and a "Right Shoulder arthroscopic subacromial decompression." AR at 531. According to Dr. Allen, Plaintiff was to be scheduled for surgery on September 13, 2017. AR at 531.

However, records from a late September office visit with Dr. Thomas indicate that Plaintiff's shoulder surgery did not take place as scheduled. AR at 540. Dr. Thomas explained that "[h]e is deferred surgery on the right shoulder for now." AR at 540. Although Plaintiff complained about pain in his left shoulder, he reported that an injection in his right shoulder, administered at his previous visit, had "worked well." AR

---

[8] An EST, or exercise stress test, is the most common type of stress used to "measure the amount of stress your heart can manage before it beats in an irregular rhythm or affects your blood flow." *Exercise Stress Test with Diabetes*, WebMD, https://www.webmd.com/diabetes/diagnosing-stress-tests, (last visited Dec. 10, 2020).

at 540.

Several months later, in December 2017, Dr. Thomas again saw Plaintiff for shoulder pain, but Plaintiff's complaints at that time related to only his *left* shoulder. AR at 547-49. Plaintiff described his right shoulder as "pain free" following an injection at a previous appointment. AR at 548. Additionally, Dr. Thomas' notes indicate that Plaintiff's right shoulder showed full range of motion without tenderness. AR at 549.

In summary, the record provides some support for both Plaintiff's position (i.e. that he was unable to have shoulder surgery because Dr. Thomas would not clear him) and for the agency's position (i.e. that Plaintiff *elected* not to have right shoulder surgery). The record reveals that Plaintiff elected not to have right shoulder surgery when it was first recommended by Dr. Allen in 2015. But the record also suggests that Plaintiff later became receptive to the idea of shoulder surgery in 2017. At that time, Dr. Thomas refused, at least initially, to clear Plaintiff for the procedure. Thereafter, Dr. Thomas outlined conditions on which he would approve Plaintiff's shoulder surgery. Plaintiff took steps toward satisfying those conditions, including having a colonoscopy, and expressed a continued desire to undergo the procedure. It was in September 2017 that Dr. Thomas indicated that Plaintiff "is deferred surgery on the right shoulder for now." AR at 540. Significantly, Dr. Thomas's records do not specify whether Plaintiff *elected* to defer surgery, or whether the surgery was deferred because Dr. Thomas was unwilling to clear Plaintiff for surgery. Both scenarios are possible under the circumstances. Ultimately, no shoulder surgery took place before Plaintiff's date last insured. There is also no express indication that Dr. Thomas cleared Plaintiff for surgery before December 2017. At the same time, there is also evidence suggesting that at the

end of the relevant period, in December 2017, Plaintiff's pain in his right shoulder had been alleviated through injections.

In any event, Plaintiff's failure to undergo the recommended shoulder surgery was one of the principal reasons that the ALJ found Plaintiff's complaints concerning his shoulder impairments to be overstated. Throughout his decision, the ALJ emphasized that right shoulder surgery had been recommended to Plaintiff and scheduled multiple times, but Plaintiff had not undergone the surgery. *See, e.g.*, AR at 24 ("surgery was recommended," but Plaintiff "wished to postpone it"); AR at 24 ("He was noted to other providers to be scheduled for shoulder surgery in March/April, but there is no evidence that this occurred."); AR at 25 ("was scheduled multiple times for arthroscopic surgery, but did not follow through); AR at 26 ("has failed to follow through with scheduled surgeries and physical therapy"). Significantly, the ALJ attributed Plaintiff's lack of surgical intervention to his failure to "follow through" with the recommended surgery. *See* AR at 26.

The failure to follow a prescribed course of treatment, without good reason, is grounds for denial of disability benefits, 20 C.F.R. § 404.1530(b), and can be the basis for discrediting a claimant's subjective complaints. *See Diaz v. Sec'y of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990). The Tenth Circuit has set out four elements that an ALJ must consider before determining that a claimant's failure to undertake treatment precludes his recovery of disability benefits. *Teter v. Heckler*, 775 F.2d 1104,1107 (10th Cir. 1985). Those elements are: "(1) the treatment at issue should be expected to restore the claimant's ability to work; (2) the treatment must have been prescribed; (3) the treatment must have been refused; (4) the refusal must have been

27

without justifiable excuse." *Id.* (citing *Jones v. Heckler*, 702 F.2d 950, 953 (11th Cir. 1983); *Cassiday v. Schweiker*, 663 F.2d 745, 749 (7th Cir. 1981); *Schena v. Secretary*, 635 F.2d 15, 19 (1st Cir. 1980)).

Here, the ALJ did not address the *Teter* factors before finding that Plaintiff failed to "follow through" with the recommended shoulder surgery. For instance, he did not specifically find that Plaintiff "refused" the surgery, only that he failed to "follow through" with it. Nor did he expressly consider whether Plaintiff's failure to obtain the recommended surgery may have been justifiably excused given a lack of medical clearance by Dr. Thomas.

The regulations set forth examples of good reasons for not following recommended treatment. 20 C.F.R. § 404.1530(c). One example of a justifiable excuse for noncompliance is that the treatment or surgery is "very risky" for the claimant. 20 C.F.R. § 404.1530(c)(4). Here, the records suggest that, at least in January 2017, Dr. Thomas declined to clear Plaintiff for shoulder surgery because Plaintiff was "not in good health to heal properly to recover." AR at 665. Yet, in rejecting Plaintiff's claims of disabling shoulder pain, the ALJ relied primarily upon Plaintiff's failure to "follow through" to obtain shoulder surgery despite multiple recommendations and surgery dates. But substantial evidence does not support this finding by the ALJ.

Because the ALJ seemingly failed to consider whether there was a justifiable excuse for Plaintiff's failure to undergo shoulder surgery, such as a lack of medical clearance, the Court will grant Plaintiff's motion on this issue. On remand, the ALJ should provide a meaningful analysis as to the reasons Plaintiff failed to obtain shoulder surgery.

28

**E. Substantial evidence supports the ALJ's finding that Plaintiff's sleep apnea and insomnia did not cause greater limitations than those assessed in the RFC.**

Plaintiff contends that the ALJ failed to address significant limitations caused by his sleep apnea and insomnia. *Doc. 15* at 24. The ALJ's discussion of these impairments is unquestionably limited. His assessment, offered at Step Two of his sequential evaluation, consists of the following: "The claimant's medically determinable impairments of obstructive sleep apnea, primary insomnia, hernia, hypertension, and anemia, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic work activities and are therefore nonsevere." AR at 20. Beyond this, the ALJ's only other reference to Plaintiff's sleep problems was a notation indicating that, in October 2017, Plaintiff reported worsening insomnia. AR at 25.

Considering all of Plaintiff's impairments, the ALJ found Plaintiff "limited during the period at issue to a level of light work with postural, manipulative, and environmental limitations." AR at 26. The ALJ explained that despite "worsening symptoms," Plaintiff's mental status exam findings were "overall normal." AR at 26. Even so, the ALJ limited Plaintiff to unskilled work with only occasional interaction with co-workers, supervisors, and the general public. AR at 26. But the ALJ determined that "the lack of objective medical evidence fail[ed] to support substantially greater limitations." AR at 26.

Plaintiff contends that his medical records show worsening sleep symptoms resulting in vocationally relevant limitations, particularly in his ability to concentrate. *Doc. 20* at 9-10 (citing AR 497, 562). In support, he references a March 13, 2017 sleep study, which details 36 respiratory events and 40 arousals over the course of 6.6 hours.

29

*Doc. 15* at 24; *see* AR at 465. Plaintiff maintains that given the findings of this sleep study, "the ALJ's finding that sleep apnea [was] non-severe at Step Two [was] contrary to substantial evidence and absurd." *Doc. 15* at 24. The Court disagrees.

The report from the sleep study referenced by Plaintiff indicates that a month earlier, in February 2017, Plaintiff underwent a polysomnography ("PSG") designed to diagnose sleep disorders. AR at 465. The PSG revealed that Plaintiff had severe sleep apnea. AR at 465. As a result, he returned on March 13, 2017, for a continuous positive airway pressure ("CPAP") titration sleep study. AR at 465. During the titration sleep study providers adjusted the pressure of a CPAP to ascertain the optimal pressure Plaintiff required. AR at 466. The providers determined that Plaintiff's sleep apnea was *controlled* with the CPAP set at 14.0 cmH2O. AR at 465.

None of the records Plaintiff cites attribute specific functional limitations to his sleep problems. Although Plaintiff maintains that his sleep apnea and insomnia negatively impacted his ability to concentrate, the records he references shows that his sleep apnea was controlled with a properly adjusted CPAP. AR at 465. Moreover, additional records reveal that Plaintiff experienced improvement in insomnia-related symptoms with medications and treatment. *See, e.g.*, AR at 590 (Oct. 31, 2017 record rating severity of insomnia symptoms as 2/10 and reporting that "Zyprexa helps . . . to get to sleep"); 598 (Aug. 16, 2017 record reporting cessation of nightmares, hearing sounds less frequently after taking Zyprexa 45 minutes before bed, and rating the severity of his insomnia symptoms as 0/10), 623 (Jan. 23, 2018 record reporting "sleep disrupted by some nightmares and frequent waking when doesn't use cpap" and rating severity of insomnia symptoms as 2/10). Ultimately, the Court is satisfied that

substantial evidence supports the ALJ's finding that sleep apnea and insomnia did not cause greater limitations than those assessed in the RFC. The Court denies Plaintiff's motion as to this ground.

> ### F. The Court will not address Plaintiff's final argument concerning a purported contradiction between the SCO and jobs identified by the vocational expert.

Plaintiff's final argument is that the ALJ failed to assess contradictions between the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles ("SCO") and jobs identified by the vocational expert that required at least frequent reaching. *Doc. 15* at 23. The Court will not address this final issue, because it "may be affected by the ALJ's treatment of this case on remand." *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

## V. Conclusion

The Court finds that the ALJ erred in failing to include or explain the omission of an adaptation limitation in the RFC and in failing to consider whether there was a justifiable excuse for Plaintiff's failure to undergo right shoulder surgery. On remand, the ALJ should also consider addressing additional factors to bolster his findings as to Dr. Koltuska-Haskin's opinions.

Wherefore,

**IT IS ORDERED** that Plaintiff's Motion to Reverse and/or Remand (*Doc. 15*) is **GRANTED** in part.

_____

UNITED STATES MAGISTRATE JUDGE
Presiding by Consent